TEVA PHARMACEUTICALS USA, INC.,

*Plaintiff*,

v.

ELI LILLY AND COMPANY,

*Defendant.*

Civil Action No. 1:24-cv-2008
PUBLIC REDACTED VERSION

## COMPLAINT

Plaintiff Teva Pharmaceuticals USA, Inc. ("Teva") brings this action against Defendant Eli Lilly and Company ("Lilly") for monetary damages caused by Lilly's breach of contract and related tortious actions.

## NATURE OF THE ACTION

1. This case is about Lilly unjustly depriving patients of access to a lower cost version of its osteoporosis medicine Forteo (teriparatide injection) by wrongfully prolonging its monopoly and, consequently, delaying generic competition. In 2023, Lilly was making *$1 million per day* on Forteo, without a generic competitor on the market. Lilly knew, however, that generic entry could occur any day, which would decimate Lilly's Forteo revenues. In fact, in a settlement agreement it entered into with Teva in 2018 concerning Teva's proposed generic Forteo product, Lilly had given Teva ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████  Those provisions should have opened the door for Teva's entry by the middle of 2023, if not sooner.

2. But in clear breach of that agreement—and to postpone generic entry and protect its highly profitable Forteo revenue stream at the expense of patients—Lilly took affirmative steps to improperly delay the Food and Drug Administration's ("FDA") approval of Teva's generic Forteo product. Specifically, Lilly filed a supplement to its Forteo new drug application ("NDA") and advocated for FDA to recognize a new regulatory exclusivity for Forteo which would block approval of any generic Forteo products. By themselves, those actions clearly and unequivocally breached the agreement. Lilly then compounded its breach by ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

And, to make matters worse, even though Lilly knew Teva had no other way of discovering the existence of Lilly's exclusivity request, Lilly did nothing to notify Teva of its request. Lilly thus breached its obligations to Teva, failed to take any action itself to address that breach, and also failed to provide Teva the information it would have needed to take action on its own to mitigate the harm caused by Lilly's bad acts. Indeed, Lilly made sure to keep its breach hidden, such that the effects of Lilly's conduct in delaying Teva's approval could not be undone and patients would continue paying much higher prices for Lilly's Forteo product.

3. As a result of Lilly's conduct, FDA did not know about ████████████ and therefore held off approving Teva's product while FDA evaluated whether Forteo was entitled to the new regulatory exclusivity, causing Teva's product to be approved substantially later than it otherwise would and should have been. This delay in Teva's approval—again, caused by Lilly's own wrongful conduct—allowed Lilly to continue pocketing monopoly profits while depriving

patients of access to lower priced, therapeutically equivalent teriparatide products.  It also caused Teva to lose tens of millions of dollars or more in lost sales and profits.  Teva brings this case to recover the damages it suffered, and continues to suffer, from Lilly's wrongful actions.

**THE PARTIES**

4.      Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business at 400 Interpace Parkway #3, Parsippany, New Jersey, 07054.

5.      Defendant Eli Lilly and Company ("Lilly") is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana, 46285.

**JURISDICTION AND VENUE**

6.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as it is a dispute between citizens of different States and the amount in controversy exceeds $75,000.

7.      This Court has personal jurisdiction over Lilly because Lilly has availed itself of the legal protections of the State of Indiana by, among other things, incorporating in and maintaining its principal place of business in Indiana.  This Court also has personal jurisdiction over Lilly because Lilly has substantial, systematic, and continuous contacts with this District and regularly transacts business in Indiana and in this District.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Lilly resides in this District and because Lilly is subject to personal jurisdiction in this District. Furthermore, venue is also proper as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

**FACTUAL ALLEGATIONS**

**Forteo, Teva's ANDA, and the Forteo Patent Litigation**

9.      On November 29, 2000, Lilly submitted New Drug Application No. 021318 to FDA for approval of its product Forteo, a teriparatide injection indicated for several uses

including the treatment of postmenopausal women with osteoporosis and to increase bone mass in men with primary or hypergonadal osteoporosis. Forteo was approved by FDA on November 26, 2002, and Lilly launched its product and has sold it in the United States ever since. For 2023 alone, Lilly reported net sales for Forteo in the United States of $335 million.

10. Lilly also listed several patents in FDA's *Orange Book* as claiming Forteo (the "Forteo Patents").

11. When FDA approved Forteo, it required a box warning regarding findings of osteosarcoma and Forteo's approval was contingent on Lilly's commitment to establishing a surveillance program to evaluate whether there was an association between the use of Forteo and the occurrence of osteosarcoma. Lilly's required surveillance program included at least five post-marketing observational safety studies, initiated between 2003 and 2009, and continued through September 30, 2019.

12. On July 27, 2015, Teva filed Abbreviated New Drug Application (ANDA) No. 208569 for a generic teriparatide injection product, and Teva listed Forteo as the referenced product (the "Teva ANDA" or "Teva's ANDA"). Under the Hatch Waxman Act, 21 U.S.C. § 355(j)(2)(A)(vii), when a generic company files an ANDA, it is required to submit a certification to FDA regarding the patent status of the referenced product. Teva's ANDA included so-called Paragraph IV certifications under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) to some or all of the Forteo Patents. Teva's Paragraph IV certifications asserted that Teva's ANDA would not infringe any valid or enforceable claims of the Forteo Patents to which the certifications applied. On February 3, 2016, Teva provided Lilly notice of its Paragraph IV certifications as required by the Hatch Waxman Act.

13. Teva was the first, though not the only, company to file a substantially complete ANDA for a teriparatide injection that contained a Paragraph IV certification. As a result, Teva was potentially eligible for 180 days of generic drug exclusivity pursuant to 21 U.S.C. § 355(j)(5)(B)(iv), during which time Teva would be able to sell its teriparatide injection without competition from any other teriparatide injection ANDA product. This 180 days of potential generic drug exclusivity under the Hatch Waxman Act benefits the public by encouraging generic drug innovation and challenges to weak patents, accelerating generic entry and benefiting patients by making lower priced generic versions of innovative drugs more rapidly available.

14. On March 16, 2016, Lilly filed a lawsuit for patent infringement against Teva in this Court, alleging that Teva's ANDA infringed one or more of the Forteo Patents. *Eli Lilly and Company v. Teva Pharmaceuticals USA, Inc.*, C.A. No. 1:16-cv-596-TWP-MFB (S.D. Ind.).

**The Lilly-Teva Forteo Settlement Agreement**

15. Almost two years later, Lilly and Teva entered into a Litigation Settlement Agreement effective January 2, 2018, resolving the Forteo patent litigation between them (the "Settlement Agreement," attached as Exhibit A). The basic compromise at the center of the settlement ███████████████████████████████████████████ ███████████████████████████████████████ Specifically, Teva promised Lilly ██████████ ███████████████████████████████████████████ ████████████████████ In return, Lilly promised Teva ██████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████ These terms were interrelated, each provided consideration for the other, and the

agreement would not have been reached without the inclusion of both terms.  The compromise is embodied in several sections of the Settlement Agreement, including, but not limited to, the following.

16. In Section 5.1(b), ████████████████████████████████████████ ████████████████████████████████████████████ ████████

17. In Section 4.1, Lilly and Teva ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████

18. Also in Section 4.1, Lilly and Teva ██████████████████████ ████████████ As relevant here, FDA law provides for certain regulatory exclusivities where the supplement to an NDA contains reports of new clinical investigations (other than bioavailability studies) that (a) are essential to the approval of the supplement, and (b) were sponsored by the applicant.  These types of regulatory exclusivities are independent of patent rights, both in that an NDA holder does not need a patent to obtain a regulatory exclusivity, and in that a patent license does not itself apply to a regulatory exclusivity.  As a result, an NDA holder's regulatory exclusivity could potentially block the approval and sale of an ANDA, even if the NDA holder had no patent rights that could do so.  ████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████

19. To ensure that Teva would get the full benefit of the compromise, in Section 5.2, Lilly promised ████████████████████████████████████████████████



20. Lilly also agreed in Section 5.2 ██████████████████████████████ ████████████████████████████████████████ █████████████████

21. In addition, under Section 4.4, Teva █████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████

22. Through these and other provisions, Lilly promised Teva that ████████ ████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████

23. The ████████████████████████ in the Settlement Agreement running in Teva's favor were material terms that go to the essence of the bargain struck between Teva and Lilly and without which Teva would not have agreed to the terms of the Settlement Agreement.

**Lilly Pursues and Obtains a New Regulatory Exclusivity for Forteo Without Telling Teva**
██████████████████████████████████████████████████

24.     In January 2020, Lilly submitted a supplement to the Forteo NDA ("sNDA") seeking approval for certain efficacy-related changes to the package insert for Forteo.  FDA approved the Forteo sNDA on November 16, 2020.

25.     FDA's 2020 approval letter posted on the FDA website contained no statement about any regulatory exclusivity associated with the Forteo sNDA.  In addition, the entries for Forteo in the publicly available website for FDA's *Orange Book*, including the "Patent and Exclusivity Information" section of those entries, said nothing about any regulatory exclusivity associated with the 2020 sNDA.

26.     But, in fact, the sNDA was the basis on which Lilly sought, and ultimately obtained, a new three-year exclusivity for Forteo that ran until November 16, 2023.

27.     On information and belief, the Forteo sNDA, which served as the basis for Lilly's exclusivity request, had long been in the works.  Lilly had begun conducting safety studies in support of the sNDA application more than a decade before settling Teva's patent litigation.  Some of the supporting studies remained ongoing at the time Lilly and Teva executed the Settlement Agreement in January 2018, with the final study not concluding until September 30, 2019.

28.     Despite Lilly's promise in the Settlement Agreement that ███████████ ████████████████████████████████████████████████████ ████████████ it affirmatively petitioned FDA, ██████████████████████ ██ at the expense of teriparatide injection patients, to recognize a three-year exclusivity for Forteo based on the 2020 sNDA—knowing full well that this exclusivity, if granted, would delay the approval and launch of Teva's generic product.

29.    On August 5, 2021, a law firm submitted a 12-page letter on Lilly's behalf to the chair of FDA's "Exclusivity Board," the group responsible for exclusivity determinations.  That letter argued that FDA should "confirm the application of 3-year [new clinical investigation] exclusivity" retroactive to the November 2020 sNDA approval date for the supplement and asked that "FDA promptly confirm the . . . exclusivity . . . in the *Orange Book*."

30.    Nowhere does the August 5, 2021 letter refer to Teva or otherwise notify FDA



31.    There was only one reason for Lilly to advocate for three-year exclusivity based on the Forteo sNDA:  Lilly wanted to use that exclusivity,



32.    On information and belief, Lilly continued to advocate for FDA to recognize a three-year exclusivity for the Forteo sNDA throughout 2021, 2022, and 2023.  And even though Lilly's covenant



33.    Likewise, at no time did Lilly

Lilly knew that its exclusivity request was not publicly available and that Teva had no reasonable means of learning about Lilly's exclusivity request except from Lilly itself.

Lilly took affirmative steps to ensure that Teva did not learn about the pending exclusivity right.  On



information and belief, Lilly affirmatively concealed this information from Teva because Lilly knew that, ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

34. Even though Teva's ANDA was pending the entire time that FDA was considering whether to recognize a new three-year exclusivity for Forteo, FDA did not inform Teva that this process was occurring and that it could potentially delay approval of Teva's ANDA, consistent with the agency's established general practice not to make such information public until final action has been taken. On information and belief, Lilly was aware that FDA would not inform Teva about the pending exclusivity determination prior to final action, consistent with agency practice. It was only after the new exclusivity was first made public on October 16, 2023, that Teva was able to obtain certain information about how the new exclusivity came into existence through Freedom of Information Act Requests to FDA.

35. On October 16, 2023, the FDA Exclusivity Board recommended that FDA "recognize 3-year exclusivity" for the Forteo sNDA. Also on October 16, 2023, FDA published in the *Orange Book* that Lilly had been granted a retroactive three-year exclusivity for Forteo running until November 16, 2023, with the exclusivity starting the day FDA approved the Forteo sNDA in 2020. As Lilly was no doubt aware, that exclusivity would block FDA from approving any ANDA for a teriparatide injection until it expired, absent a waiver from Lilly itself. The entire exclusivity period, including the date Lilly first filed its sNDA and its exclusivity request,

████████████████████████████████████████████

36.     Prior to October 16, 2023, there was no public information indicating that Lilly was advocating for, or that FDA was considering granting, any exclusivity in connection with the Forteo sNDA.  To the contrary, a reasonable person would have assumed that, were any exclusivity to apply in connection with the sNDA, it would have been published in the *Orange Book* at the time the sNDA was approved in November 2020 or shortly thereafter, and the absence of any published exclusivity indicated that none applied.

**The New Forteo Exclusivity Delayed FDA Approval of Teva's ANDA**

37.     Teva diligently pursued its ANDA both before and after the Settlement Agreement, seeking FDA approval to launch ███████████████████████████ ███████████████.

38.     By no later than the summer of 2023, FDA confirmed that Teva had satisfied all the regulatory requirements for approval of the Teva ANDA.  FDA also informed Teva at that time, however, that FDA nonetheless could not approve Teva's ANDA due to undisclosed "complex regulatory issues," for which FDA declined to provide any further specificity.

39.     Had FDA approved the Teva ANDA as soon as Teva had satisfied all the regulatory requirements for approval, Teva would have promptly launched and begun sales of its teriparatide injection in the United States.  Teva had the manufacturing capacity and the product supply to be able to commence sales immediately upon FDA approval or shortly thereafter.  Moreover, Teva has extensive experience marketing generic drug products in the United States and would have successfully contracted with purchasers to acquire Teva's product.  Typically, once generics enter the market, prices drop substantially because generics sell for less than the brand had charged for its product before generic entry.  And that was the case here, once Teva and others obtained FDA approval and brought their generics to market.  Had Lilly not

improperly delayed Teva's approval, which in turn delayed Teva's launch, patients would have benefited from substantially lower-cost teriparatide injections much sooner than they did.

40. On October 16, 2023, when the new Forteo exclusivity was made public, Teva learned for the first time that Lilly had been pursuing, and that FDA had been considering, a new regulatory exclusivity for Forteo. After publishing the exclusivity, FDA confirmed to Teva that this new, three-year exclusivity was the "complex regulatory issue" that had been the only impediment to Teva's approval.

41. Teva immediately contacted Lilly on October 16, 2023, and demanded that Lilly ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████. Lilly did not provide an immediate response. Teva contacted FDA the next day, informing FDA ████████ ██████████████████████████ and taking all steps it could to secure immediate approval of the Teva ANDA.

42. On October 20, 2023, Lilly responded to Teva's October 16 letter and, in further breach of the Settlement Agreement, Lilly refused to comply with its obligations and reneged on its agreement ███████████████████████████████████████ Notwithstanding the plain language of the Settlement Agreement, Lilly ██████████████ ██████████████████████████████████████████ Teva urged Lilly to reconsider and stated that Teva would view Lilly's ███████████████ as a breach of contract.

43. Instead of acknowledging its clear obligations under the Settlement Agreement, Lilly tried to extract additional concessions and releases from Teva ██████████████████ ██████████████████████ Specifically, Lilly initially conditioned its willingness to

███████████████████████████████████████████████████████ on Teva's assent to broad releases of any claims whatsoever arising out of the Settlement Agreement. Teva refused Lilly's blatant effort to renegotiate the deal it had struck nearly six years prior and reminded Lilly that its effort to link its willingness ██████████████████████ to Teva's execution of additional releases was itself actionable conduct.

44. On October 27, 2023, less than three weeks before the expiration of the regulatory exclusivity that Lilly had been working for years to obtain, Lilly finally agreed ████████████ ████████████████████████████████████████████████████████ ████████████████████████████

45. FDA granted final approval to Teva's ANDA on November 16, 2023, the same day that Lilly's new exclusivity lapsed and many months after FDA had informed Teva that its ANDA was otherwise eligible for approval.

46. ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████

47. The only impediments that had prevented FDA from granting final approval to Teva's ANDA prior to November 2023 were the pendency of Lilly's request that FDA recognize a new regulatory exclusivity for Forteo, FDA's subsequent confirmation of that exclusivity, and the fact that Lilly had neither ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ Had Lilly timely notified

██████████, FDA ████████████████████████████ would have approved Teva's ANDA once Teva had otherwise satisfied the requirements for approval.

**Teva Suffered Substantial Harm from Lilly's Breach of its Obligations to Teva**

48. Lilly breached its obligations to Teva under the Settlement Agreement by ████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████ Lilly submitted its Forteo sNDA described above and affirmatively sought recognition of a three-year regulatory exclusivity on the basis of that submission, ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

49. Lilly had every opportunity to mitigate the effects of its breach on Teva, but it doubled down instead. Throughout the period that Lilly was pursuing and FDA was considering the regulatory exclusivity, Lilly concealed the facts ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████

50. Lilly also understood that Teva had no way of discovering Lilly's request for a new three-year exclusivity and intentionally withheld from Teva that it was pursuing a new regulatory exclusivity covering Forteo. Lilly thus ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████

████████ In this way, too, Lilly deprived Teva of the benefit of the bargain in the Settlement Agreement.

51. On information and belief, Lilly's breach of its obligations under the Settlement Agreement was intentional and willful. At all relevant times, Lilly knew it was actively preparing and/or advocating for recognition of the exclusivity. And Lilly knew that FDA ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ to delay FDA's approval of Teva's ANDA, allowing Lilly to continue to reap monopoly profits in the absence of generic competition to Forteo at the expense of patients' access to lower cost medicine.

52. On information and belief, Lilly knew that had Teva become aware of the potential exclusivity, Teva would have contacted FDA directly ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ And Lilly knew that FDA ████████████████████████████████████████████████████ ██████████████████████████████████████ Lilly deliberately withheld from Teva the existence of the exclusivity application, to maximize Lilly's ability to use the exclusivity to delay FDA's approval of Teva's ANDA, allowing Lilly to continue to reap monopoly profits in the absence of generic competition to Forteo.

53. On information and belief, Lilly knew that Teva was the first-filer ANDA applicant for Forteo. The 180-day exclusivity provides the first ANDA filer 180 days of generic

sale exclusivity, generally preventing other ANDA filers from entering the market until the first filer's exclusivity has lapsed. By delaying approval of Teva's ANDA, Lilly also potentially could delay the approval of any other ANDAs for Forteo until 180 days after Teva started selling its product. This was just one more piece of Lilly's strategy to protect its significant Forteo revenue stream and harm patients by further delaying lower cost generic teriparatide injection options.

54. Lilly had strong financial incentives to use a new regulatory exclusivity for Forteo to delay approval of teriparatide injection ANDAs ███████████████████ ███████████████ Based on its financial disclosures, Lilly made approximately $30 million *each month* from Forteo sales prior to generic entry. Lilly also knew that those sales— and the resulting profits—would plummet once generics became available and patients switched to the lower-priced generic alternatives.

55. Lilly's failure to comply with its obligations under the Settlement Agreement was the direct and proximate cause of delay in FDA's approval of the Teva ANDA. But for Lilly's wrongful actions, FDA would have approved Teva's ANDA, and Teva would have started selling its generic teriparatide injection product in the United States much earlier.

56. Lilly's conduct damaged Teva in at least two ways. First, Teva was damaged because Lilly's actions caused a delay in Teva's ANDA approval, resulting in lost sales during the period that Teva's generic product should have been on the market but was blocked by Lilly's secret exclusivity application.

57. If Lilly had timely complied with its obligations under the Settlement Agreement, the Teva ANDA would have been approved much earlier than November 2023 and Teva would

have started selling its teriparatide injection earlier than it did, resulting in Teva making additional sales and earning additional profits.

58. Second, due to the wrongful delay in FDA's approval of Teva's generic, Teva did not secure the additional sales from exclusivity that it otherwise would have enjoyed, instead facing a generic competitor immediately following the November 2023 approval. If Lilly had complied with the Settlement Agreement, Teva would have sold with exclusivity for some time for two independent reasons. But-for Lilly's breach, Teva would have retained its 180-day first-filer exclusivity. In addition, on information and belief, Teva was the only ANDA filer █████ ████████████████████████████████████████████ but-for Lilly's breach, Teva would have received FDA approval and commenced sales before the sNDA three-year exclusivity lapsed, while all other ANDA approvals would have been blocked by it.

59. The sales Teva would have made during exclusivity would have been particularly profitable. If Lilly had timely complied with its obligations under the Settlement Agreement, Teva would have sold its teriparatide injection for a substantial period of time with limited competition from other generic teriparatide injection products. Instead, because FDA approved another generic teriparatide injection ANDA on the same day it approved the Teva ANDA, Teva has faced competition from that other ANDA product the entire time Teva's product has been on the market, as well as from an authorized generic version of Forteo that Lilly licensed. If Lilly had not improperly delayed FDA approval of the Teva ANDA, Teva would have received final approval and started selling its product well before any other ANDAs were approved, thereby enjoying the full benefit of its first-filer status for the 180-day exclusivity period and, independently, of its regulatory waiver. In that situation Teva would have faced competition, at most, from an authorized generic version of Forteo licensed by Lilly. As a result, Teva would

have been able to sell its teriparatide injection at relatively higher prices (albeit still below the price of Forteo), and capture a relatively higher volume of sales, during the period before any other ANDAs were approved.

60. In addition, Teva's sales volumes from November 2023 forward would have been higher if Lilly had not wrongfully delayed FDA approval of the Teva ANDA. In the marketplace for generic pharmaceutical products, the first ANDA product for a particular drug benefits from a first-mover advantage, which allows it to retain a disproportionately large share of sales against subsequently-entering generics for the same drug. Lilly's wrongful conduct cost Teva the benefits of the first-mover advantage, depressing Teva's sales and profits even after Teva brought its product to market.

61. Teva's lost profits from Lilly's wrongful actions are in the range, at a minimum, of tens of millions of dollars.

**COUNT I – BREACH OF CONTRACT**

62. Plaintiff repeats and realleges the allegations of paragraphs 1-61 as if fully set forth herein.

63. Lilly and Teva entered into the Settlement Agreement, effective January 2, 2018, to resolve the parties' Hatch Waxman litigation involving Lilly's Forteo and Teva's teriparatide injection product.

64. Under the terms of the Settlement Agreement, Lilly promised ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

[REDACTED]

65. Lilly breached its obligations under the Settlement Agreement by filing its sNDA and requesting a new three-year regulatory exclusivity [REDACTED]

[REDACTED]

66. In addition, rather than attempt to mitigate the effects of its material breach, Lilly's additional actions and inactions compounded the effects of its breaches and constituted additional breaches of the Settlement Agreement. Lilly intentionally [REDACTED]

[REDACTED]

67.     As a direct and proximate result of Lilly's breaches, individually and collectively, Teva has been harmed, including by delay in its regulatory approval which substantially damaged Teva in its ability to launch its teriparatide injection product and caused Teva damages of tens of millions of dollars in lost sales and profits.

## COUNT II – UNJUST ENRICHMENT

68.     Plaintiff repeats and realleges the allegations of paragraphs 1-67 as if fully set forth herein.

69.     Lilly engaged in improper and anticompetitive conduct which was intended to and did, in fact, delay generic entry by preventing FDA from approving Teva's ANDA earlier than it did.  Lilly wrongfully secured and knowingly reaped the unjust benefits of millions of dollars of profit in monopoly sales of its own Forteo product while simultaneously keeping Teva's product off the market—profits that were the direct result of Lilly's anticompetitive conduct.

70.     Lilly has been enriched by the monopoly revenues and profits it received from continuing to sell Forteo free from generic competition while FDA approval of Teva's ANDA was delayed—revenues that would have gone to Teva as the first generic entrant in the teriparatide injection market in the United States.

71.     Lilly should not be permitted to retain these wrongfully obtained monopoly profits which were the result of their anticompetitive conduct.

72.     As a direct and proximate cause of Lilly's unjust enrichment, Teva has suffered ascertainable losses and damages as described herein in an amount to be determined at trial.

**COUNT III – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**

73. Plaintiff repeats and realleges the allegations of paragraphs 1-72 as if fully set forth herein.

74. Lilly was aware that in order for Teva to sell its teriparatide injection product in the United States, it would need to enter into commercial contracts with its customers for the purchase and distribution of its product. In fact, the parties provided ███████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

75. By ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████ Lilly knowingly and intentionally interfered with Teva's business relationships with its customers by intentionally delaying FDA approval of Teva's ANDA, and thereby, delaying Teva's ability to offer and sell its teriparatide injection product to its customers.

76. Lilly understood that ██████████████████████, Teva's ANDA could not be approved, even with FDA's sign off on other regulatory requirements. Lilly leveraged its knowledge of the FDA approval process to prevent FDA from approving Teva's ANDA sooner than it did ██████████████████████████ Every day of delay meant another day Lilly could continue to rake in monopoly profits on its branded product in the marketplace and another day Teva would not engage its customers to offer its teriparatide injection at much lower prices than Forteo.

77.     Lilly was fully aware of these regulatory hurdles and intentionally and knowingly leveraged those dynamics to interfere with Teva's ability to engage its customers to sell Teva's teriparatide injection without any justification for doing so.

78.     Lilly interfered with Teva's business relationships by unlawfully maintaining its monopoly and by engaging in misleading communications with FDA.

79.     Teva has been damaged by Lilly's tortious interference.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests a jury trial on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment:

a)     That Lilly breached the Settlement Agreement;

b)     That Lilly has been unjustly enriched;

c)     That Lilly tortiously interfered with Teva's actual and prospective commercial relationships with purchasers of its teriparatide injection;

d)     That Lilly's conduct was the direct and proximate cause of loss to Teva;

e)     Awarding Teva damages, including punitive damages, costs, and fees; and

f)     Awarding any other relief that may be just and proper.

Dated: November 14, 2024

Respectfully submitted,

By: */s/ Kandi Kilkelly Hidde*

Kandi Kilkelly Hidde, No. 18033-49
Darren A. Craig, No. 25534-49
FROST BROWN TODD LLP
111 Monument Circle, Suite 4500
P.O. Box 44961
Indianapolis, IN 46244-0961
(317) 237-3800
khidde@fbtlaw.com
dcraig@fbtlaw.com

Christopher T. Holding (*pro hac vice pending)*
Alicia Rubio-Spring (*pro hac vice pending)*
Katharine Foote (*pro hac vice pending)*
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02110
(617) 570-1000
CHolding@goodwinlaw.com
ARubio-Spring@goodwinlaw.com
KFoote@goodwinlaw.com

Andrew Hill (*pro hac vice pending)*
GOODWIN PROCTER LLP
1900 N St. NW
Washington, DC 20036
(202) 346-4000
AndrewHill1@goodwinlaw.com

*Attorneys for Plaintiff Teva Pharmaceuticals USA, Inc.*